Brady. My name is Jerry. We know my office is in Springfield, Virginia. I represent Jesus Chavez in this case. I'll be splitting time with my co-counsel, Mr. Amos, so I'll try to move as quickly as I possibly can. I want to deal first with the Brady imputed knowledge issue because that applies to all defendants. When I finish that, then I'll get into issues that are specific as to Mr. Chavez. I'll try to go through those as quickly as possible. This issue, this Brady imputed knowledge issue revolves around a gentleman who goes by the nickname of Junior. Junior was an MS-13 member who the government alleges he left the gang, went to work for the FBI. In the course of working for the FBI, he gained immigration benefits and was paid by the federal government. His testimony had great significance in this case. The government used Junior to interpret, and I use interpret in quotations, to interpret recordings. He was so important to their case. They characterized him in their closing argument as a hero. That's a joint appendix, 6440. No other witness in this case was characterized as a hero, and I submit they were sending a signal to the jury. They needed to buttress his credibility and really buck him up to the jury, and that's why they characterized him in that way. He was a very important witness. And just to illustrate further how important a witness Junior was, what the government would do is they would read him a portion of a transcript, and they would ask this question. And when I say a transcript, I mean a recording. They would ask this question or an extremely close variation of it. Mr. Junior, what do you understand that to mean? I counted up how many times they asked that question. Forget about redirecting. When you get down to the bottom of it, you're talking about an FBI letter in support of a green card application, right? No. Yes, that was the letter that was... That's the NAPU issue. Okay. Yes, sir. All right, well, what's the Brady issue? Sure. So... I thought you were arguing them both. I am. The more prominent... I only have limited time, and so I wanted to address the Brady issue, which I consider the more prominent. On the NAPU issue, what we're arguing is the judge failed to provide an evidentiary hearing on the NAPU issue. I think that sums that up pretty quickly. The judge refused to provide that despite evidence that the letter that you're talking about, the prosecutor knew about false testimony and yet allowed it to go on. And the judge failed to provide an evidentiary hearing. I'm speaking now to the Brady issue and the imputed knowledge issue. Okay. Okay. They asked that question, what do you understand that to mean, Mr. Junior, 169 times. And I'm using that to illustrate how important he was to the government's case. That does not include redirect. That's solely in just direct testimony, direct examination. Now, during Mr. Junior's testimony, I made a request with Judge Lee. You know, I've been practicing law since 1982, and to be direct with you, sometimes you've got to feel as a witness that they're slippery. And so I asked Judge Lee, I said, Judge, Mr. Junior here is on the witness stand, and I ask that you allow me to issue a subpoena dues as taken. And the point of the subpoena dues as taken was to compel Junior to produce his immigration file. Specifically, I asked for his adjustment application. Judge Lee said, what do you base that on? Just as I told you, I said, Judge, it's just a gut feeling. You can just feel it that this witness is a slippery guy. Denied. And maybe you all would have denied it too. Nevertheless, that was Judge Lee's decision. After that, we go on. All the defendants are convicted. All right. With respect to the Brady issue. Yes, sir. Were the defendants even in possession of Junior's immigration records at the time of trial? We were not. We were given a letter. Was the government in possession of those immigration records? I would submit they are, and that's the imputed knowledge issue. You really authored a decision on that that's very relevant to this case, and that's the Robinson case. And I believe you authored that in 2010. And the significance of your decision was, you said, there's no hard and fast rule when you come to the issue of imputed knowledge. And I think what you were really trying to say is, you got to look at the facts of the individual case as to justify whether there would be knowledge imputed to the prosecutor. Right. But I mean, isn't it a little bit different? Doesn't it make your Brady claim more problematic if the immigration records were not in possession of the government at the time of trial? They were in possession of DHS. It's a question of what you mean by the government. Yes, sir. And you wanted to find the government broadly to include any agency of the government. And I'd like to explain why. Yes, sir. Our question is... Understood. Is it in their business? I was referring to the prosecution. Right. Because as I understand it, DHS was not a part of any investigative team. I don't agree with that. With respect to this case. I don't agree with that. Okay. Let's assume all of that in your argument. Sure. To make out a Brady Cain claim, you have to show prejudice, right? We do. And there are two other independent witnesses for each one of these appellants. Understood. So, where is your prejudice? Let me address the materiality issue. First, the issue of the case of Wherry v. Cain speaks to that, which is the question of additional impeachment evidence against an already impeached witness is sufficient to satisfy the materiality requirement. So, I focus the materiality issue on the prominence of Junior to the government's case. They used him over two days of testimony to define recordings and what these recordings meant as to all defendants. But specifically as to Chavez. Well, all six defendants crossed examined Junior extensively. I mean, all six of you. That is accurate. We did not have the impeachment evidence that would have been highly important in this case. And that's the reason I cite Wherry v. McCain. Wherry v. Cain. I guess I'm skeptical of the Brady claim on two levels. One is the materiality because we have a, this is a seven week trial and the jury had heard 44 witnesses on it. There were five cooperating defendants. There were two eyewitnesses to the particular crimes that were charged. There was all six defendants got a chance to cross examine Junior extensively. That's as to the materiality point. Then as to whether the government defaulted in its Brady obligations. I thought that when you are talking about, of course, the government broadly is going to have immigration records. But I thought when we were talking about Brady claims, we're generally talking about the prosecution and the investigative materials of a particular case. And I don't think the government, the prosecution was in possession of those weapons or the DHS or the, was part of the investigative or prosecutorial team or that the immigration service was. I mean, I'm sort of reluctant to take the point of view on a Brady claim that any time a piece of information is present anywhere within the entirety of the federal government, that the prosecutor in a particular case has an obligation to hand that over. Sure. And that, that, that expands it quite substantially. And that's even apart from the materiality point. I'll address both. And I use a combination of factors dealing with first the Brady claim itself. Keep in mind as to this case, as to keep Junior in the United States. For example, a joint appendix 3585 of Brenda Bourne, who's the FBI agent, she indicates and she says specifically, he, Junior, knew that keeping him in the United States was not an FBI decision. It was a DHS decision or immigration decision. Even more to the point on that, I alleged in our opening brief that were it not for United States and unavailable to the government during the latter part of the investigation, as well as a witness at trial. In other words, you can't be more central to his, to the convictions in this case than DHS was. Moreover, Judge Lee issued an expansive discovery order in this case. That discovery order reached specifically as to false statements. And you have that as part of the, in the joint appendix. It deals with Brady and Giglio. And Judge Lee issued a very expansive discovery order, which the government acknowledged applied to Junior. And that's at 3834. Finally on that issue is the government had reason to believe he was a liar. They had reason to know that Junior was a treacherous guy. How do we know that? You'll see the testimony of Claudio Sa, who's the government gang expert. He's a police officer from Herndon, Virginia. We've given you some extra time here. You've got some more time coming on rebuttal. Yes, sir. Thank you. All right. Mr. Amolch. Let's hear from you. Thank you, Your Honor. I'm going to focus my argument, Your Honor, as it relates to my client, Mr. Cerna. Focus your argument. Mr. Cerna. I'm going to be addressing the judge's ruling as it relates to the admissibility of Mr. Cerna's participation in an uncharged murder, as well as whether Mr. Cerna's motions for severance related to the second prosecutor in the room as it relates to Mr. Guevara, whether the judge should have granted the severance and did not. So I was going to start first with the issue of the uncharged murder that the government, we allege, introduced evidence of Mr. Cerna's participation in that. To remind the court, Mr. Cerna was initially indicted for two charges. He was indicted for the murder of Mr. Trujillo. Mr. Aguilar, the government, brought that charge against Mr. Cerna, even though, statutorily speaking, the penalties available to him were unconstitutional. That was appealed to this court. This court issued a ruling saying Mr. Cerna could not be charged with the Trujillo murder because the only penalties available were life in prison or death, both of which the Supreme Court found to be unconstitutional for youths who commit those crimes. So the case was sent back to Judge Lee. And this court didn't rule that Mr. Cerna couldn't be charged with anything as it related to Mr. Trujillo's murder. Well, the court gave some instructions here, particularly said, he instructed the jury, said Mr. Cerna is not on trial for the Trujillo murder. But he went even further than that and said that the jury simply could not consider using evidence of Trujillo's reburial as evidence that Cerna had somehow killed Aguilar. So he prohibited Trujillo from being charged with that. Trujillo apparently was reburied. And the judge says, okay, you can't use that reburial evidence as evidence that Cerna killed Aguilar. And he also says to the jury, Cerna is not on trial for the Trujillo's murder. Now, if you're not, this is really a question of severance. It's framed and pleaded in a different way. But if you're not on trial for the Trujillo's murder, it's really trying to get at the question of whether the district court should have severed all these cases. And that, it seems to me, is a separate issue because if people are indicted together, normally they're tried together. But I thought the district court, given if there was no abuse of discretion and the failure to sever, it's a different issue. If I could correct the court's recollection of the facts, I wish the court had ruled that evidence of Mr. Cerna's participation in the reburial of Trujillo was not admissible and the jury should not consider that. The judge actually issued two separate findings on this. The judge issued a ruling saying that there could be no evidence at all of Mr. Cerna's active participation in the murder of Mr. Trujillo. The government filed a motion then saying, fine, we disagree with that. We believe it's 404B. The judge said, no, you can't admit any active participation. But he's not even charged with Trujillo's murder. He's only charged with Aguilar's murder. So the whole charging document doesn't try to impute Trujillo's murder to Cerna. That's correct. So once this court ruled that he couldn't be charged with the Trujillo murder, the government filed a motion and said, fine, we can't charge him with it, but we want to introduce evidence of his participation in the Trujillo murder under 404B. So setting aside whether he can be substantively charged with it, we want to introduce that as evidence suggestive of his participation in the second actual charged murder. And Judge Lee said, we're not doing that either. We're not doing a 404B. That's painful to you. It was. And that's correct. He's leading up to it. That's what I'm getting to. But I want to correct you. Yeah, Judge, I want to talk to Judge Wilkins. I want to correct your, I think, recollection of the facts, at least as I understand it. The government then, in our opinion, violated that order by admitting evidence that Mr. Cerna had participated in Trujillo's murder, directly participated in that, in violation of the court's order. We made several mistrial motions based on that. Our take on the evidence is that Agent Born, a cooperating witness, Adele Sid, and the prosecutor herself suggested to the jury through direct questioning and the witness testimony that Mr. Cerna had, in fact, participated in Trujillo's murder in violation of the court's order not to. The court also said, though, as it relates to the participation in the reburial of Trujillo, that that evidence was fair game, that that was not covered by the 404B ruling. The 404B ruling was limited to Mr. Cerna's direct participation, but any evidence about Mr. Cerna's knowledge about the Trujillo murder beforehand or his participation in the reburial afterwards was not covered by the 404B ruling. And we take issue with that as well, our position being that that evidence is just as prejudicial as his participation in the actual murder itself, that the evidence about Mr. Cerna's participation in the reburial, his knowledge of facts specific about how the... You understand that what came as a result of all this, this evidence came in as 404B evidence? It did. So you got a 404B argument. That's what we argued. Well, and the judge's ruling on that might have been wrong. Well, the judge's ruling was that it could be... Part and parcel of the whole scheme is the misplaced 404B. Well, that's not what Judge Lee said. Judge Lee said... He said he ruled in your favor, but he said he was complying with his ruling. So that's... Correct.  I agree, Your Honor. And our position is that... Even if you're wrong, it wouldn't be error under our precedent under 404B. I agree with you, Your Honor, but my point is... He's giving away your case, if you do. Well, no, I believe that the 404B ruling is in place, and while it was favorable to us, our position is the government nevertheless violated. He didn't enforce his own rule. He let him slip by. That's correct. That is our position. That's the position. They say they didn't. That's exactly what Judge King said to you, and if he was, well, we could take a different view of the 404 ruling. I misunderstood Judge King's argument. I misunderstood... That's exactly what I did. Oh, I apologize, Judge, that I misunderstood what you were saying. I misunderstood what you were saying. My position is that that was Judge Lee's ruling. That it was the correct ruling. That it was the... But that 404B ruling may have been inconsistent with our precedent. I don't agree that it was. I believe that... in the context of this case, to make that kind of ruling, I don't have any problem with that, but we're pretty loose on 404B. I disagree with all those rulings as well, Your Honor, but as it relates to this... But I don't... They don't say they don't exist. No, I agree, but in this particular case, Judge Lee found you couldn't admit evidence of it, and they did it anyway, and we objected. We thought that same reasoning... It doesn't answer the question of whether it's intrinsic. Okay, the intrinsic argument, Judge Lee found in his ruling that there was nothing intrinsic about the unrelated murder that happened six weeks, seven weeks beforehand for the actual charge murder. That this Court has taken a very narrow ruling of what intrinsic evidence is that would allow it to escape the confines of 404B. And Judge Lee's initial rulings described in detail why this was not intrinsic. There was nothing that was necessary to prove an element of the offense. They weren't otherwise related. They were separate events in time. There were... Some of the counts were conspiracy counts. Our client was not charged with conspiracy, Judge. Our count was charged with substantive. They're all being tried together. They were. And wouldn't... Normally, when you have conspiracy counts, the definition of intrinsic is a little bit broader. My client was not charged with... Because it relates... I know, but... conspiracy or not, it still can be... This kind of evidence can still be intrinsic to the entire conspiracy because they were all the defendants. I thought the theory, the government's theory of the case was that defendants were involved in a conspiracy. The government's theory was... As a result of their common membership in this gang and the aims and purposes of the gang. That was not alleged in the indictment. The alleged... The allegation against my client was that he killed Mr. Aguilar in order to facilitate his position within the gang and to rise within it. There was no allegation that he was involved in a conspiracy involving anybody else. And I don't think it can be the state of the law that if one person is charged with... What transcripts did the jury receive here? Okay. Well, there were transcripts and then there were oral recordings. There were many, many, many hours of Spanish... Then turned into transcripts. The transcripts themselves are not the evidence. The oral recording, the telephone conversations are the recordings, are the evidence. The government and I went back and forth about how to redact those transcripts to eliminate Mr. Serna's alleged participation in that, in the Aguilar murder. I'm sorry, the Trujillo murder. So I thought all counsel agreed to those redactions in the transcripts. Mr. Togler and I went back and forth on that and we came to some agreements. I reserved my agreement. You came to some agreement. The transcripts were pretty significantly redacted? They were, but the recordings themselves still went back to the jury. All right. Well, do you have some rebuttal time to... That's the real evidence. I mean, which is my point, Justice Kinglet. Right. It's regardless of how the transcripts were, the tapes themselves were not redacted. They went back and that's the evidence. The way Judge Lee handled this thing, about all the issues, you raised a discretionary cause on the part of the trial court that we shouldn't be second guessing. Well, I don't think you shouldn't be second guessing them, Judge. I think you should be second guessing. I think you should be looking and determining whether you got a fair trial or not. In conjunction, I don't think that he did. I'll reserve the rest of my time for the separate session. Thank you. Thank you. Mr. Tobler. May it please the court. For the reasons set forth in the government's brief, each of the defendant's claims on appeal, including all of the claims that were argued here today, fail on the merits. But even if any of these claims had merit, which they do not, they fail for the additional reason that the defendants cannot, and in most instances here, do not even attempt to demonstrate prejudice. Rather, any alleged violations utterly fail to preponderate against what the district court fairly characterized as a, quote, mountain of evidence that was, quote, substantial, overwhelming, and significantly corroborated. I'll turn now to the legal claims, starting with the Brady claim. There was one general comment I had, is that so often, it seems to me, they will make a motion to sever trials, and the district court will deny it on the just general axiom that when you're indicted together, you're tried together. And then at the end of the trial, there'll be all kinds of claims that evidence came in impermissibly against one of the defendants, evidence generally relating to another defendant. And, but that all traces back to, did the district judge abuse the motion, did the district judge abuse its discretion in declining to sever? And given the interconnections here, it doesn't seem to me that he did. And if there's no severance, there is inevitably going to be a certain amount of evidence introduced against one defendant, which does not apply to another defendant. And you try to do your best to eliminate any kind of prejudice in a very long trial. And I thought the court was fairly emphatic in saying that Cerner was not on trial for Trujillo's murder. But this happens so often in these multi-defendant trials, where they lose on the severance motion, and then, oh, but this came in, and this came in, and I was, and that's what's developing here. Yes, Your Honor, and I would just, I agree with the points that you've made. And just to add to that, I don't believe that the defendant Cerner actually sought a severance in any case. He just sought to keep out certain evidence that the judge agreed was admissible under Rule 404B and under an intrinsic theory. And I would just add, Your Honor, Judge King made the point that perhaps the judge was wrong in the first instance, in not permitting the government to introduce evidence of the fact that Cerner also participated in Trujillo's murder. We argued forcefully at the time that the government should be allowed to offer that evidence. The district court disagreed, but we also believe to this day that it would be justified as being admitted under Rule 404B, even subject to Rule 403, because even though the evidence was certainly very damning in the sense that it showed that Cerner participated in a second murder, that, this court has noted in Van Meter, for instance, that where the, there is no unfair prejudice under Rule 403, where the extrinsic act is no more sensational or disturbing than the crimes with which, with which the defendant was charged. The crime they were charged with, or he was charged with, was murder. Cerner was charged with the murder of Aguiar. He was an adult. He was over the age of 18 at that time. It was a horrific murder with horrific facts. And of course, the evidence, notwithstanding the characterizations of defense counsel today,  Cerner participated in the murder of Trujillo, did not come in. It was not allowed to come in. All of our witnesses tested. And they're saying that you basically circumvented the court's ruling on the 404B. Your position is you didn't. Yes. We did not attempt to circumvent the court's ruling. And we did not, in fact, circumvent the court's ruling. And I, just to clear up a few things. And the trial court was in the best position to assess that. We agree, Your Honor. And as far as the mistrial motions go, there were several of them. Those were briefed before the court. And I think that's the basis for Cerner arguing now that the jury. But I'm saying that evidence of Cerner's involvement in Trujillo's reburial was essentially evidence that he was involved with Trujillo's murder. Which, of course, it was not. There were actually, as a matter of fact, multiple people, including the defendant Benitez, who participated in Trujillo's reburial, who did not participate in Trujillo's murder in the first instance. And I think it's also clear from the record that it is really bending over backwards to read the record and say that the jury would have made the inference that he was involved in Trujillo's murder for a number of reasons. First of all, there was no direct evidence that Cerner participated in Trujillo's murder. And on this point, I just want to make something clear. The transcripts that went back, which the court has in the record, omit any reference to Cerner participating in Trujillo's murder. That was all redacted. That's correct. And it is not correct to say that the phone calls, which were in Spanish, so they couldn't have been understood anyway by the jury, went back. They actually did not go back, as counsel will recall. We talked about the potential problem that the recordings were not redacted. Your position is that any participation in someone's reburial is not, on that account, evidence that he participated in the murder of the reburied person? Yes, that is our position, Your Honor. And in fact, that was not the case in this very case, looking at the facts of this very case. As I understand it, you briefly said that the reburial evidence was a critical link in the government's evidentiary claim, chain, because Cerner showed Junior the location of Trujillo's body, which led to the FBI's discovery of Trujillo's remains. Stand by that? Yes, Your Honor. But this relates only to the Trujillo murder, with which Cerner was not charged. So how does that fact mean that the government needed the evidence to prove an evidentiary link with respect to someone else, make it admissible with respect to Trujillo? Yes, Your Honor. I appreciate the question, Your Honor, because two defendants that were part of the same case were charged with the murder of Trujillo. And the bodies and the location of the bodies was very important evidence to the United States government. Defendant Torres and Defendant- You should have done the same thing by using the homeboy pseudonym in reference to the Trujillo burial, and not using Cerner's name? There was a single trip that Cerner led Junior, and it was video recorded, and portions of the video were actually played for the jury. There was a single trip in which Defendant Cerner led Junior, who was wired at the time for video and for audio, to both bodies together. So the evidence was very closely intertwined. And the government certainly wouldn't want to forfeit the very, very important evidence against Cerner as to the Aguiar murder, the murder for which he was charged, that was on those videos and in those transcripts, because in those videos and transcripts, Cerner led Junior not only to the first body, but to the second body as well, which clearly shows a number of things with respect to- You can make some of the transcripts in the video available, and not all of them. It would have been- I really don't understand that. Your Honor, it would have been difficult to do under the circumstances, because there are some citations that we give to the record in the brief, and Your Honors can review the record for yourself. It would have been difficult to redact it in that way, because, again, in any event, even if it were redacted, we would have to have a stipulation that the evidence was discovered in the park, or perhaps testimony about Homeboy 3 or Homeboy 4. And at that point- You used the Homeboy things otherwise. That's why I just- I do think it would have been, Your Honor, somewhat a pointless exercise, because at this point the jury would have seen a video of Junior leading- We would have read a stipulation of the record that said, on the same date, or on a date around that time, somebody led Junior to another body. I'm quite sure that Mr. Amolsch would have objected to anything like that. But as far as the larger point is concerned, I think the evidence is admissible, and under both- both as intrinsic, but also as Rule 404B evidence against Cerna. The fact that he knew that the gang had previously engaged in a murder in that park. We also believed, and this was the reason we believed the act of Trujillo's murder was, in fact, admissible against Cerna in the first instance, that it's direct evidence of the fact that he's participating in a racketeering enterprise. There was a question from, Your Honor, Judge Wilkinson. Well, weren't they all charged with a conspiracy in this case? It's true that they were not charged with a conspiracy, but as the indictment makes clear, or rather not all of these defendants were, they were charged with being members of the same racketeering- the same racketeering enterprise. It is an element to proving, and just use Cerna as an example, it is an element to proving that Cerna is guilty of murder and aid of racketeering to show that he is a member in the racketeering enterprise, and evidence that he participated in a previous murder, or evidence that he led another person who he believed was a trusted gang member to bodies within the park that he helped at the very least rebury is direct evidence, and it goes directly also to his state of mind. So we believe it was admissible. Do you believe it was admissible on both 404B and Intrinsic? We believe not only that the evidence of the reburial was admissible under both theories, but we believe, in fact, the evidence of the murder was admissible. I think it's a closer call with respect to Rule 403. With respect to the murder, just to be clear. He ruled against you on part of that. He did, Your Honor. And you've got to respect that. He had right- that's the law of the case. Yes, Your Honor. He ruled against you. And we're certainly not asking the court to revisit that decision. I'm just making a rhetorical point that not only was the reburial evidence very clearly admissible, but also arguably even the evidence of the murder. At least that's the position that we've taken. And certainly under Rule 403, there is no issue with introducing the reburial evidence because it is far less incendiary than the evidence and the calls introduced against Mr. Cerna describing a murder in which he participated proudly, I might add, as is very clear from the record in this case, in the beheading of a second victim. Go ahead. Do you remember your colleague on the other side talked about the- going back and forth with the government about what should and should not be in these calls or in these- and so was there ultimately agreement? It was never really clear on that. Or did you take these things to the judge and he made a call or what? No, Your Honor. It wasn't necessary to go to the judge. To be very clear, Mr. Amol's counsel for Mr. Cerna had a standing objection that any evidence that Cerna participated in the reburial should not be. And so because the evidence that Cerna participated in the reburial was in the redacted transcripts that went back, that objection obviously we never reached a resolution on that. There were some very strong incendiary language that was used by Mr. Lemus Cerna in some of these transcripts that the government- The transcripts or the language was with respect to other defendants as well. That's correct. We believe so. Mr. Cerna used some very strong language, if I recall correctly, and I don't want to mischaracterize it before it, that simply it did not go to his guilt on these issues and it could be used against him. And I think it was appropriate that Mr. Amol raised that issue with the government and we sat down and we were able to strike some of that language. You're saying that the reburial evidence was not covered by Judge Lee's exclusionary 404B ruling? That's correct. And the judge was very clear on that, not only one time, but actually I believe a total of three or four times. Mr. Amol- The judge made it clear that the reburial evidence was not to be excluded. Was not to be excluded. And you say that's not an abuse of discretion because of the simple element of a racketeering enterprise? For a number of reasons, that being one, Your Honor. One of them. We believe that it was extrinsic because it completed the story of the crime on trial for the reasons I discussed with Your Honor- Did it go to intent or knowledge? It also went to his intent and knowledge because he obviously knew that if he- All of these defendants, or at least I should say most of the defendants, made an argument that they were not there or that they didn't realize what was about to happen or that they only intended in the case of- at least this comes out in the briefs, that Cerna argued that he only intended to injure, perhaps, but not kill the victim, despite the fact that he helped dig a grave for the victim before the assault actually began. So this was very much a live issue. The state of mind, the knowledge of Cerna at trial. And so it was admissible under 404B for those reasons as well. I'm sorry, I still don't understand the state of the recordings or the conversations or whatever they are. Did the government and the defense agree on what finally the redactions would be? We reached an agreement subject to Mr. Amolsch's continuing standing objection, which was that there was no evidence, for instance, in the transcripts that went back to the jury that Cerna participated in Trujillo's murder. Okay, but I think part of the issue is semantics. But he objected to all of it anyway. I'm sorry? He objected to all the recordings anyway. He objected to the transcripts going back without complete redaction, if I remember correctly, complete redaction of any reference, essentially, to Cerna being at the- touching the body, coming into contact with Trujillo's body, participating in the reburial at all. His argument, as I understand it in the briefs, is that that was actually evidence that Cerna participated in the murder. But we disagree, and more importantly, the district court disagrees. The district court admitted that, and he preserved his objection to that. But you let him- you went ahead and let him pick and choose or make his arguments on the transcripts or the recordings anyway? There was very strong language that his client, Mr. Cerna, used on the transcripts relating to women and, if I remember correctly, homosexuality that we thought had no bearing on the case and was unduly prejudicial and didn't add anything to the government's presentation. But you objected upon that as well. That's- that's correct. That's where the accommodation- Did these recordings only affect Mr. Cerna? In what sense? Well, I mean, is he the only person that's implicated? In the recordings? No, we have recordings in which multiple defendants- That's what I thought. Yeah. I mean, he's one of many. He's one- he's- he's one of many. No, we have- Every time I ask you about it, you come back to him. No, no. What about all the arrest of these people? I apologize, Your Honor. Do you agree with them? What you have here is a crime wave. Right, and we have- You called it a recap. And turning to the points about prejudice where I started, in addition to, as Your Honor alluded to, Judge Wilkinson, there being at least two eyewitnesses to each of these crimes, five cooperating witnesses, there were 14 recordings that were entered into evidence. So the transcripts went back to the jury. In those 14 recordings or transcripts, did the government come to agreement- leave aside, Mr. Turner, in respect to your answer here- with the defendant on what was going to go to the jury? To my recollection, to the best of my recollection, Mr. Amos was the only attorney that contacted us about making redactions of the type that we agreed to in Mr. Cerna's transcripts. Okay, but did other defense lawyers come to you with respect to other defendants? They certainly made objections to the very admissibility of the transcripts. That wasn't raised on appeal. That's not an issue before this court, but the issue was whether or not the linguists were sufficiently reliable. The court found if they were, it hasn't been raised on appeal. In these multi-defendant trials, some defendants are going to be charged with one act, and some defendants are going to be charged with another act. And, I mean, all the counts in the indictment don't apply to all the defendants in a multi-defendant trial. And it's inevitable that you're going to have evidence introduced at trial which pertains to one or two defendants, but not to all six or seven. And unless we want to do away with multi-defendant trials altogether and the considerable efficiencies they present for everybody, the best a district court can do is to try to separate these things out for the jury and give what I thought the district court said here, which was that it emphasized for the jury that Mr. Cerno was simply charged with the Aguilar murder and not with Fajio's murder. Now, did he mention that? I mean, he emphasized that to the jury in the instructions, did he not? Not only did he give a typical instruction, he actually gave an instruction that was crafted by Mr. Amos, or I should say, by defense counsel for Mr. Cerno. So there were two instructions. There was a general instruction about spillover prejudice, to guard against spillover prejudice, that applied to all the defendants. He also gave a separate instruction that was specific, that I believe the court read, that said, Mr. Cerno specifically, it cannot be held against him anything that happened with respect to the murder of Trujillo. So in fact, you went a step beyond normal limiting instructions. I don't know what exactly a district judge can do in a multi-defendant trial other than to try to separate the defendants and emphasize for the jury that you don't want evidence against one defendant slipping over impermissibly into evidence against another. And Judge Lee tried to do that. And that's, you know, I don't know how else you go about it. Your Honor, we agree. We believe that the judge issued appropriate instructions. And we also believe a point I don't want to omit to make, and I think it's clear from the record. That is that any potential prejudice, any potential spillover prejudice in this case, was so minimal compared to the mountain of evidence against all of these defendants. As I alluded to, to Your Honor, Judge Motz, there were more than 35 witnesses in this case. Five cooperating witnesses, no less than two eyewitnesses to each of these cases, to this case. There were 14 recordings involving five of the defendants on appeal here, in which they described in graphic detail who, the what, the where, and the why to Junior, who they believed was a trusted member of MS-13. The defendants also self-identified in these recordings. And there was FBI surveillance of Junior with these defendants, Castillo, Torres, Benitez. And as I mentioned before, there's actually video of Cerna leading him to the bodies as he discusses the crime. So just quickly turn back to the Brady issue. I see I'm out of time. Go ahead and wrap it up, but very quickly, we gave the other folks a little extra time. And I'll give you a little bit, but not much. Yes, thank you, Your Honor. With respect to the Brady issue, I believe that the court is- It falters on materiality. I believe it falters on materiality for the reasons that I've just stated. I also believe that there were no records suppressed in this case. Did the government, materiality aside, did the government default on a disclosure obligation? No, Your Honor. The government did not default on a disclosure obligation. How do you define government in this case as the prosecuting and investigative team? Yes, and the language comes from Kyle, actors known to be acting on the government's behalf in the case, a member of the investigative team. And the defendants, I would just add, cite no authority for- Kyle, the Supreme Court case? Kyle's, yes, Your Honor. There's no authority for the defendant sweeping proposition, and they cite none, that because the FBI applied to the Department of Homeland Security for immigration records, it somehow transforms that agency, which, as Your Honors are aware, is a vast agency, into a part of the investigative team for Brady and for Giglio purposes. The government has cited a case from another circuit that we believe is on point. That's Casas. It's cited in the brief where the First Circuit saw exactly this issue and held that the prosecution team had no duty to know and to obtain what was in the process. You know, that would be a pretty large extension of Brady if the immigration records were not at all in the possession of the prosecution, for example. But I'm worried about having an obligation to hand over records that are somewhere in the federal government. Yes, Your Honor. Did you just say that the FBI obtained the records from Homeland Security? Or did I mishear you, or did you misspeak? No, we, as Your Honors are aware, maybe we're from the record, just to make something clear. After this trial ended, Judge Brinkema, in a subsequent case for a severed defendant, ordered the government to go out and obtain and conduct an independent review of those materials. We went out and obtained the materials. But not during this case. No, Your Honor. And we disclosed them after this case. That's correct. And we disclosed them at that time. They were used in the subsequent trial of Cerritos to cross-examine the witness. Our argument all along has been that their value was de minimis in light of the days of cross-examination, which Your Honors alluded to, in light of the overwhelming evidence in this case. And the jury in the Duran-Cerritos case convicted Duran-Cerritos in a matter of hours. No more time. Thank you, Your Honor. All right. Judge, I want to clear up. I'm sorry. Oh, yeah. Go ahead, because you've got your rebuttal time. Yes, sir. I want to clear up a misunderstanding that I feel is occurring, which is Chavez presented a strong and substantial defense here. And I mean strong. I submit that he should have been given a new trial under our Rule 33 motion, in light of the strength of that evidence, that it was against the overwhelming weight of the evidence. That strength, I really need to describe the defense that he offered in this case, because it was potent. Vidal Jimenez was a government witness. Jimenez said, I know tattoos. I've seen hundreds of tattoos in my life. I know gang members. I used to be a member. What about the district court's comment about when the Rule 33 motion was brought up before, and the district court said what apparently the jury said? Says this was not a close case. I don't agree with that. I don't agree with that at all. That's right. But you have a, just like a prosecution, you have a perspective from one side of it. And that's why we have juries and district judges to supply the neutral perspective. And you have a flat statement here by the district judge saying that the Chavez case is not a close case. First of all, you'll notice in there, he did not consider all the evidence relative to our Rule 33 motion. For example, he only considered. And the evidence, we look at it now in the light most favorable to the prosecution because the jury returned a guilty verdict. Well, I understand that. So you have to look at it in the light most favorable to the prosecution. Nevertheless, the judge on a Rule 33 motion has a right to consider credibility issues. You likewise have a right to review the judge's decision on that issue about the credibility issues. In this particular case, Jimenez testified that he knew tattoos in and out. And that within two hours of the shooting, he told Detective Buckley that the shooter had tattoos on both forearms. No mistake about that. Would Detective Betz testify? Chavez didn't have tattoos on his arms. No way. In addition to that, there was a testimony of a civilian witness unrelated to this case, a working man, Cosme Gonzalez. He comes home around 1120 at night on the night of the murder. What does he observe? He observes the decedent, Urrutia, in an argument with a shirtless male, a shirtless male over a drug debt. What does he do? He goes inside his house. And within a few seconds, he hears a shot. He looks out the window and sees the shirtless male standing over Urrutia's body and then runs into the woods and appears to hide something. Interestingly, Gonzalez's testimony is corroborated to some degree by Officer Michael Garcia, who was the first officer to arrive at the crime scene. What does he testify to? He testifies that he observed a shirtless male who was confrontational with Officer Garcia. The point I'm making is that Chavez really did offer a substantial defense in this case. And it goes to different issues. It goes to the Rule 33 issue, but it also goes to the Brady issue about the strength of the defense that he offered, which was significant. In addition to that, in this case, we've alleged, and I stand by the comments, issues of prosecutorial misconduct. I realize my time is limited. I'm just going to run through these very quickly. The prosecutor in this case received a judicial admonition in front of the jury for improper behavior. That improper behavior dealt with the issue of suggesting answers. You can suggest an answer to witnesses in two ways, through leading questions, but you can also do it through speaking objections. That went on repeatedly in this case, which Judge Lee noted. We get to a point where Gattuso, one of the government witnesses who claims that he saw my client participate in the murder, failed to identify Mr. Chavez as the person that was at the crime scene. He fails flat out. He picks another person in the courtroom and said, that's Chavez right there. The government then took it upon themselves to say to the judge, or say in front of the jury, and we submit this was done with the intent of tipping off the witness that he made a mistake, let the record reflect that the witness has failed to identify Mr. Chavez. Now, the government says in their response, well, this was just a big misunderstanding. It was no misunderstanding, and Judge Lee recognized that in his admonition because it was a precise follow-on to what had been going on throughout the case about speaking objections being used to alert witnesses about what the proper answer was. This was an attempt to likewise alert the witness that he picked the wrong guy, and that's why they did that. There was also an issue about misrepresentation of testimony. The prosecutor in closing argument stated wrongfully that Gattuso picked Mr. Chavez from a photo identification. The government tries to explain that away in their response by saying, well, he saw a picture, and in his mind he recognized him, but he didn't really, but in his mind he recognized him. But the fact is, he didn't pick him. And Officer Detective Victor Ignacio steered Gattuso towards my client. OK. Thanks. Thank you. I'm sorry. Thank you. Mr. Amos. Thank you, Your Honor. I want to take my time and briefly talk about what the government said as it relates to the overwhelming evidence against Mr. Cerna regarding his participation in the Aguilar murder. One of the last witnesses that was presented to the jury was the person who arrived after the murder and drove Mr. Cerna, among others, away from the scene. And that person testified that Mr. Cerna was not covered with blood. There was no evidence he had participated in the murder. He didn't make any statements. He was an exculpatory witness that we called, or was called by the defense to establish, that the evidence against Mr. Cerna was not overwhelming, that the evidence was largely his own words. And those words we talked about were largely braggadocious statements made by MS-13 members bragging to other MS-13 members or alleged MS-13 members about how big and tough they are, which leads into my next argument about the idea that there should have been a severance in this case. We filed several motions for severance regarding Mr. Guevara. Mr. Guevara's defense in this case was that Mr. Benitez, Mr. Cerna, they were the ones who actually participated in the murder. He was just in the wrong place at the wrong time. We filed several motions for severance arguing not just that Mr. Guevara's defense was inconsistent with ours, but that it was actually adversarial, that he was, in fact, another prosecutor in the room. We put into evidence exactly how that happened. But I would like to draw the court's attention to one particular exchange, because it deals with exactly this issue about Mr. Cerna's own words and the weight the jury should give them. The government called the witness detectives, Officer Saw, who was a gang expert, who talked about the fact that MS-13 members are braggadocious. They run their mouths. They say they did things they didn't do, that they're generally speaking untrustworthy people. On direct examination, that's what he testified. We then cross-examined Detective Saw, Officer Saw, about the fact that they are often untruthful and say things they don't mean. After Mr. Guevara's counsel was the last one to cross-examine the officer, and then spent the entirety of his cross-examination rehabilitating the government's witness, because in his mind, Mr. Cerna and Mr. Benitez, their statements regarding their participation in Mr. Aguilar's murder were truthful, that they should be believed, that they don't lie. And his entire cross-examination was not about why his client didn't do it or why the evidence against his client was insufficient, but about how the evidence was overwhelming against our clients. He was, in fact, throwing our clients to the jury to be convicted in exchange for his client getting a walk. He was another prosecutor in the room. We filed several motions on this, because he didn't just attack the government's evidence. He went out of his way to prosecute our clients. In all due respect to Mr. Tobler, he was often the best prosecutor in the room, because he had these witnesses on cross-examination. He could lead them right where he wanted them to go. And, in fact, did a much better job rehabilitating Detective Officer Saa than Mr. Tobler ever could have done, because he could just speak the testimony. And we made these objections over and over again to Judge Lee that this is improper as it relates to Mr. Benitez and Mr. Cerna. We can't deal with both the government and Mr. Guevara. Like, he needs his own trial. If his defense is that we did it as opposed to he didn't, he needs to have his own trial. And the Judge Lee consistently denied. That's a meaningful argument, Judge, and I don't want to get that lost. Thank you, Judge. I appreciate it. We'll adjourn court, and then we'll come down and greet counsel. This honorable court stands adjourned. Signed, I, God Save the United States. This honorable court.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Robert B. King